CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

EVAN M. MATEER (CABN 326848)
DAVID WARD (CABN 239504)
Assistant United States Attorneys

 1301 Clay Street, Suite 340S
 Oakland, California 94612
 Telephone: (510) 637-3680
 FAX: (510) 637-3724
 Evan.mateer@usdoj.gov
 David.ward@usdoj.gov

Attorney for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br> v.<br><br>GUNJAN AGGARWAL,<br><br>  Defendant. | CASE NO. 4:23-CR-00428-JST-4<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

## I.   INTRODUCTION

Defendant Gunjan Aggarwal comes before the Court for sentencing having pled guilty to participating in two separate insurance fraud conspiracies, schemes which caused the collapse of two insurance companies in two different states, costing hundreds of victims tens of millions of dollars in losses.  To his credit, after being confronted by the FBI, but before he was charged, Aggarwal quickly pled guilty and cooperated with the government in its investigation.  But even considering this early acceptance of responsibility and his substantial assistance to the government, given the magnitude of the fraud and the real-world harm that Aggarwal caused to hundreds of victims, the government recommends a custodial sentence of 24 months, followed by three years of supervised release.

## II.   OFFENSE CONDUCT AND BACKGROUND

### A.   Offense Conduct

Beginning in 2018 and lasting until March 2020, Aggarwal participated in conspiracies to defraud insurance regulators regarding the assets of two companies: Global Hawk RRG ("Global Hawk") in Vermont and Houston General Insurance Exchange ("Houston General") in Texas.  While Aggarwal was not the leader of the conspiracy, he held key roles in both companies—at certain times serving as Chief Financial Officer for both—and took key actions that enabled the fraud, including the creation of fraudulent bank and other financial records, and the concealment of "ghost policies"—off the book insurance policies that the company had written.  Ultimately, the fraud that Aggarwal enabled caused the collapse of both Global Hawk and Houston General, causing more than $60,000,000 in loss to hundreds of policyholders and claimants.

#### 1.   Aggarwal and his co-conspirators defraud Vermont regulators regarding the assets of Global Hawk, resulting in its collapse and a $46,000,000 loss

Global Hawk was a Vermont-domiciled insurance company that primarily provided liability insurance to truck drivers and trucking companies in California.  PSR ¶7.  It was founded by Defendant Jasbir Thandi in or around 2012, and organized as a risk retention group.  *Id.*  As a risk retention group, Global Hawk was regulated by the Vermont Department of Financial Regulation ("DFR") and was required to follow various regulatory requirements set by DFR.  PSR ¶10.  Among these requirements, Global Hawk was required to hire and use a "captive manager," an independent financial firm that

GOVERNMENT SENTENCING MEMO
4:23-CR-00428-JST-4                    1

monitored the company's finances, and using information from the company, prepared and filed annual and quarterly reports with the Vermont DFR.  PSR ¶1.  Global Hawk was required to meet capitalization requirements and other reporting requirements; regulations that were put in place to ensure that the company had adequate funds to cover expected liabilities.  This system was designed to prevent the failure of insurance companies and protect policyholders and potential claimants from losses.  PSR 12.

Aggarwal first began working for Thandi in 2013, when he was hired to be CFO of Global Century Insurance Brokers ("Global Century"), another of Thandi's companies which sold Global Hawk insurance policies in California.  PSR ¶9.  In or around 2014 Aggarwal created a new entity, GCIB, which was a distinct company from Global Century.  *Id.*  Aggarwal performed accounting for GCIB, which he knew was used by Thandi to write "ghost policies," which were policies in excess of what Global Hawk was entitled to write under the relevant DFR regulations, and which were not disclosed to DFR as liabilities.  *Id.*  Thandi used the ghost policies to increase his profits without having to increase the amount of insurance reserves that Global Hawk held.  *Id.*  In or around 2018, Aggarwal left Global Century; but shortly thereafter he once again began working with Thandi and the Global Hawk family of businesses, providing accounting services as an outside contractor.  PSR ¶20.

At some point, but not later than 2018, Thandi and Sahota began making fraudulent misrepresentations to DFR regarding Global Hawks assets and liabilities.  PSR ¶15.  The misrepresentations generally took the form of fraudulent financial statements that were submitted to Global Hawk's captive manager that falsely represented that Global Hawk had far greater assets than it truly had.  At first, these misrepresentations were made without Aggarwal's knowledge.  PSR ¶16. However, Aggarwal admitted that he became aware of the fraud scheme when, sometime in 2018, he walked into Sahota's office and saw him manually editing paper bank statements.  *Id.*  Rather than resign from the company or report the fraud, Aggarwal joined the scheme.  *Id.*  He began to assist Sahota with fraudulently editing the bank statements.  *Id.*  Sahota would tell Aggarwal what changes needed to be made to the financial statements, and then Aggarwal would edit the statements using a PDF editor program.  *Id.*  Sahota would generally then send the statements to Global Hawk's captive manager for their use in Global Hawks financial reporting recruitments, though on at least one occasion Aggarwal was the one to send the false statements.  PSR ¶17.  Aggarwal knew that he was editing the financial

GOVERNMENT SENTENCING MEMO
4:23-CR-00428-JST-4                                    2

statements to overstate the assets that Global Hawk actually had, and knew that they were being sent to the captive manager to misrepresent the financial health of the company.  PSR ¶16.  Global Hawk's captive manager was deceived by the false statements, and used the false financial data to prepare materially false financial statements that were submitted to DFR.  PSR ¶18.

In or about April 2020, Global Hawk's fraud was uncovered by the captive manager and reported to DFR.  PSR ¶24.  DFR determined that Global Hawk was insolvent, and placed the company into a receivership.  PSR ¶25.  Since 2020, the Global Hawk receiver has done extensive work to determine the losses that Global Hawk's insolvency caused to its creditors.  The receiver has determined that the losses caused by the fraud exceed 46,000,000, consisting primarily of losses by policyholders and individuals with claims against Global Hawk policyholders that went unpaid because of the insolvency.  PSR ¶28.  To date, almost no money has been recovered from Global Hawk.

> **2.      Aggarwal and his co-conspirators defraud the Texas Department of Insurance regarding the assets of Houston General, resulting in its collapse and a $13,000,000 loss.**

From 2018 through 2020, Aggarwal and his co-conspirators also defrauded Texas regarding the assets of a second Thandi owned insurance company, Houston General.  PSR ¶21.  Thandi purchased Houston General in 2017, and at one point Aggarwal served as the CFO before being replaced by Sahota.  *Id.*  Houston General was regulated by the Texas Department of Insurance ("TDI").  *Id.*  Texas regulations required Houston General to maintain $5,000,000 in capitalization, and it was required to submit financial statements proving that it had the required assets.  *Id.*

Houston General never had the required capitalization.  So Thandi, Aggarwal, Padda, and Sahota conspired to create false financial statements to deceive TDI into believing that Houston General had the required assets.  PSR ¶22.  This fraud took several forms.  *Id.*  First, Padda, working with Sahota and Aggarwal, created false Quantbridge statements that purported to show that Houston General had $7,000,000 of assets under Quantbridge management.  *Id.*  QuantBridge was a financial management firm run by Padda that purported to be managing and maintaining Global Hawk and Houston General's reserves.  *Id.*  In fact, Quantbridge did not manage any assets for Houston General, and Aggarwal and Padda and Sahota conspired to create false statements that left the impression that it did.  *Id.*  Aggarwal and Sahota also created false Bridge Bank statements indicating that Houston General had millions of

dollars in its bank accounts, when in fact the accounts had less than $100. *Id.* These statements were provided to Houston General's accountants, which used them to prepare financial statements for submission to TDI. *Id.* These financial statements reported that Houston General had more than $10,000,000 in assets, when in fact it had nearly no assets at all. *Id.*

In or around May 2020, TDI discovered that Houston General had no assets and the company was placed into receivership. PSR ¶23. At the time, it had approximately $13,000,000 in liabilities and nearly no assets. PSR ¶28. As with Global Hawk, Houston General's policyholders and claimants suffered significant losses. *Id.*

### B. Procedural Background

On November 16, 2023, the grand jury returned a seven-count indictment against Thandi, Sahota, and Padda related to the Global Hawk fraud conspiracy. On August 16, 2024, the grand jury returned a superseding indictment, adding Aggarwal as a defendant, and adding additional charges with respect to Sahota, Aggarwal, and Padda related to the Houston General conspiracy. On November 22, 2024, Aggarwal pled guilty to Counts One and Eight of the Superseding Indictment, admitting to conspiring to commit insurance fraud in the Global Hawk and Houston General schemes.

## III. THE SENTENCING GUIDELINES CALCULATION

The PSR calculates the offense level as follows (PSR ¶¶ 33-44):

a. Base Offense Level,  USSG §§2B1.1(a)(1).    6

b. Specific Offense Characteristic:

  a. USSG §2B1.1(b)(1)(T) (*loss between $25,000,000 and $65,000,000* )    +22

c. Role Adjustment    -2

d. Zero Point Offender    -2

e. Acceptance of Responsibility    -3

f. Total Offense Level    21

The PSR calculates Aggarwal as being in Criminal History Category I. PSR 49. The applicable sentencing guidelines range for Total Offense Level 21 and CHC I is 37-46 months. The government agrees with the PSR's calculations of Aggarwal's criminal history category. However, the government disagrees with the PSR's calculation to the extent that it does not include a 2-level increase for an

GOVERNMENT SENTENCING MEMO
4:23-CR-00428-JST-4                    4

offense harming greater than 10 victims pursuant to USSG §2B1.1(b)(2)(A)(i).[1]   The government therefore calculates the total offense level as 23, resulting in a sentencing range of 46-57 months.

### Loss Amount

The government agrees with the PSR's determination of the loss amount.  While the parties are still analyzing the financials from the Vermont and Texas liquidators to determine total restitution owed, current data shows that the total loss amount resulting from both insurance fraud schemes was in excess of $60,000,000.  This loss amount is based on the investigation of liabilities conducted by the liquidators appointed for Global Hawk RRG in Vermont and HGIC in Texas.  The Vermont liquidator determined that liabilities of 46,889,483, and assets of only 1,701,230, resulting in a total loss of 45,188,253.[2]  The Texas liquidator determined that HGIC had liabilities of at least $16,600,000, and no assets.[3]

For purposes of sentencing, Aggarwal is accountable for the full loss of the two conspiracies.  He has pleaded guilty to the conspiracies concerning both Global Hawk and Houston General, and therefore is responsible for the full amount of the loss. A "guilty plea to the conspiracy allows [a defendant] to be held liable for the entire loss amount reasonably foreseeable within the scope of his conspiratorial agreement, and not just for his criminal activity." *United States v. Wells*, 804 F. App'x 515, 518 (9th Cir. 2020).  Even though Aggarwal's participation in the scheme was more discrete than other members of the conspiracies, it was reasonably foreseeable that altering financial documents to mislead regulators regarding available assets could lead to the collapse of the insurance companies.  This was particularly

---

[1] The government did not object to the sentencing guidelines calculation in the draft PSR, overlooking the application of the enhancement for greater than 10 victims under 2B1.1(b)(2)(A)(i).  Upon reviewing the final PSR, the government realized its oversight, and notified defense counsel and the probation officer that, based on the facts, 2B1.1(b)(2)(A)(i) applied.  Because of the Court's duty to apply the correct guidelines based on the record before it, the Court should apply the 2B1.1(b)(2)(A)(i) enhancement notwithstanding the government's lack of an objection at the draft PSR stage. *See United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) (explaining that "the district court must correctly calculate the recommended Guidelines sentence and use that recommendation as the starting point and the initial benchmark") (internal quotation omitted).

[2] *See Commissioner of the Dept. of Financial Regulation v Global Hawk Insurance Co.* 196- 5020 Wncv (Vermont Superior Court), Feb. 28, 2025 (Liquidator's Eighth Status Report, Annual Accounting, and Fourth Report of Claims); Dkt. 165-2 (Declaration of J. Davis Leslie, Special Deputy Liquidator of Global Hawk Insurance Company Risk Retention Group).

[3] *See State of Tex. v. Houston Gen. Ins. Exch. & Houston Gen. Ins. Mgmt*. Co., No. D-1-GN-20-003004 (98th Dist. Ct., Travis County, Tex. filed 10/2/2023); Dkt. 165-3 (Declaration of David Ashton, Attorney, Texas Department of Insurance).

the case here, since Aggarwal was aware of the ghost policies issued by Global Hawk, which represented massive underfunded liabilities for the company, as well as Thandi's day-trading with company funds.  Since the collapse of both companies was a reasonably foreseeable outcome of both schemes in which Aggarwal participated, Aggarwal is responsible for the full loss amounts resulting from those collapses.

***Greater than 10 victims***

The PSR does not apply an enhancement under 2B1.1(b)(2)(A)(i) for causing harm to greater than 10 victims.  The government believes that this enhancement applies.  As the Court knows from the ongoing restitution proceedings in this case, there are hundreds, if not thousands, of victims that have been impacted from the collapse of these two insurance companies.  *See Commissioner of the Dept. of Financial Regulation v Global Hawk Insurance Co.* 196- 5020 Wncv (Vermont Superior Court), Feb. 28, 2025 (Liquidator's Eighth Status Report, Annual Accounting, and Fourth Report of Claims); Dkt. 165-2 (Leslie Declaration); Dkt. 165-3 (Ashton Declaration).  And these victims qualify for purposes of this enhancement.  The commentary for 2B1.1(b)(2)(A)(i) explains that a "victim" in this provision includes "any person who sustained any part of the actual loss determined under subsection (b)(1)."  The hundreds of claimants identified by the Vermont liquidator and Texas Property and Casualty Guaranty Association are the direct source of the liability figures that have been reported to the state courts by these entities, and which constitute the loss amount in this case.  There are therefore far more than 10 qualifying victims of this fraud scheme, and this enhancement applies.

***Minor Role Adjustment***

The government agrees with the PSR that Aggarwal should receive a 2-level decrease for having a minor role in the conspiracies.  The determination of whether to apply a minor or minimal role reduction is a fact-based one, and should be based on the following factors: 1) degree the defendant understood the scope and structure of the criminal activity; 2) the degree to which the defendant participated; 3) the degree to which the defendant exercised decision-making authority; 4) the nature and extent of the defendant's participation; and, 5) the degree to which the defendant stood to benefit.  *See* U.S.S.G. §3B1.2, Commentary, Note C.  A defendant is only entitled to a minor or minimal role adjustment when his role is minimal or minor compared to other participants in the same offense or in relevant conduct.

GOVERNMENT SENTENCING MEMO
4:23-CR-00428-JST-4                                6

*United States v. Kipp*, 10 F.3d 1463, 1469 (9th Cir. 1993).

While Aggarwal had a critical role in the execution of the fraud scheme, the government recognizes that there are various factors that mitigates his compared to certain of his co-defendants. While his participation in altering financial documents was central to the fraud, he does not appear to have had full knowledge of the scheme or decision making authority. He also had little financial interest in the scheme relative to the loss amount, and the government does not have evidence of Aggarwal profiting from the looting of the companies' reserves. We therefore believe that a 2-level adjustment is appropriate. However, given the length of time that Aggarwal was involved in the scheme, the central role his actions played in effectuating the fraud, and the magnitude of the losses his actions caused, the government does not believe that any larger reduction is warranted.

## IV.    ADJUSTMENT UNDER USSG 5K1.1

The government recommends that Aggarwal receive an adjustment for providing substantial assistance to the government in the investigation and prosecution of these fraud schemes. Aggarwal agreed to cooperate with the government early in the case, and before he had been charged with any crime. He took part in two interviews with the government, and provided substantial, useful information that assisted the government in charging himself with the Global Hawk scheme, as well as assisting the government in supporting the eventual Superseding Indictment that charged all four defendants with the Houston General conspiracy. Aggarwal also agreed to enter into a cooperation plea agreement relatively early in these proceedings, and did so publicly such that his cooperation was known to his co-conspirators. It is likely that Aggarwal's early, public cooperation played a role in Sahota pleading guilty and agreeing to cooperate, as well as the eventual guilty plea of Thandi.

## V.    SENTENCING RECOMMENDATION

### A.  Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing

GOVERNMENT SENTENCING MEMO
4:23-CR-00428-JST-4                              7

that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

(4)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

**B.  A Sentence of 24 Months in Prison is Sufficient but Not Greater than Necessary**

The government recommends a sentence of 24 months in prison, which is a nearly 50% variance from the applicable guidelines range.  This significant variance is justified by Aggarwal's early cooperation, which resulted in additional charges against numerous defendants related to a second fraud scheme.  However, even with this important cooperation, the government believes that a prison term is necessary given the magnitude of the fraud, Aggarwal's longtime and knowing participation, and the staggering losses caused to real world victims across several states.

**1.    Aggarwal caused tens of millions of dollars of harm to hundreds of victims**

The most important consideration in determining the appropriate sentence is the enormity of the fraud and the massive harm inflicted on hundreds of victims.  Aggarwal and his co-conspirators orchestrated a blatant fraud scheme that ran over several years and that directly caused the sudden and complete collapse of two separate insurance companies.  The sum total of the losses—more than $60,000,000—is staggering.  But even this massive loss number, by itself, is too abstract to truly demonstrate how serious this offense was.  Behind that number are hundreds of real people, who suffered substantial harm.

One large category of victims is Global Hawk and Houston General policyholders.  The rapid collapse of the two companies immediately left all their policyholders suddenly and immediately without coverage.  Most of these policyholders were individual truckers or small trucking companies, who were left holding the bag and needing to buy a new insurance policy just to continue operating.  Many of these policyholders in effect had to pay for their insurance twice.  At least one policyholder had financed their premium paid to Global Hawk with a third-party financial institution—a common practice in this insurance market—

GOVERNMENT SENTENCING MEMO
4:23-CR-00428-JST-4                              8

and was left with no insurance policy as well as a judgment against them for the debt owed to the third-party. For the independent operators and small businesses that made up most of Global Hawk and Houston General's customers, these sudden losses were a catastrophic event.

Aggarwal's fraud also left hundreds of innocent third parties unable to collect on claims after being injured by a policyholder. This is because the collapsed companies had nearly no money to pay out existing claims, a direct result of Aggarwal and his co-conspirators lying to the regulators about Global Hawk and Houston General's true assets and liabilities. As with the policyholders, each of these unpaid claimants is a real person who suffered an actual injury, and who has not been compensated. And the only reason they have not been compensated is that they had the misfortune of being injured by a Global Hawk or Houston General policyholder at the tail end of a massive fraud scheme. And some of these uncompensated injuries are catastrophic: one involves young children who were killed when they were hit in a crosswalk by a truck insured by Global Hawk. Years after the accident, the family remains uncompensated. These are the terrible fruits of Aggarwal's fraud.

This amount of fraud, and the amount of damage done to so many people, cannot go unpunished. Recognizing the seriousness of this crime and deterring others from reaping such harm in the pursuit of profit requires a substantial custodial sentence.

### 2. Aggarwal participated in the fraud for nearly three years with substantial knowledge of its purpose and scope

The nature of Aggarwal's personal participation in the fraud is another justification for a custodial sentence. Aggarwal was not a low level player or an unwitting participant. He was the CFO of Global Century, an entity that played a critical role in the fraud as the vessel for Thandi's ghost policies. Aggarwal was therefore aware of Thandi writing ghost policies, which he knew were undisclosed to regulators and not supported by sufficient capital reserves. Aggarwal was also, for a time, the CFO of Houston General, and admitted he knew that company never had the $5,000,000 in capital required by law. Aggarwal himself personally altered financial documents to represent that Global Hawk and Houston General had millions more in assets than it really did. And he did so knowing full well that they were being altered to deceive the regulators. Aggarwal's participation of the fraud also took place over many years. He admits that he first became involved in 2018, and it lasted until the collapse of the

companies in May 2020. Even when Aggarwal left the company briefly in 2019, he returned shortly thereafter and continued participating in the fraud.

In short, Aggarwal's personal culpability is significant. He knew nearly all aspects of the scheme. He knew what was being misrepresented, to whom, and why. He played a critical role in by personally altering documents. And he knew what he was doing was wrong. Such blatant wrongdoing over such a long period of time warrants a meaningful custodial sentence.

### 3. Aggarwal's post-plea actions have reduced the funds available to victims in restitution, suggesting a lack of full accountability

Although Aggarwal has now taken responsibility for his crimes by pleading guilty and agreeing to assist the government, he has also taken actions after his guilty plea that are inconsistent with his taking full accountability for his crime. Most notably, unlike some of his co-defendants, Aggarwal has not taken all actions available to him to pay as much restitution as possible. Instead, in or about the fall of 2025, months after pleading guilty and while the parties were engaged in negotiation regarding restitution, Aggarwal purchased a new home worth $1.1 million *in cash*. PSR ¶71. This purchase reduced the liquid assets that Aggarwal had available for restitution by nearly a third. *Id.* Aggarwal claims that this purchase was driven by his personal needs, and not a desire to hide assets from the government. But even if that is what he believed his motivation was, this excuse betrays a failure to internalize the harm he has done. A fully remorseful defendant would have marshalled all possible resources to pay back his victim's, rather trying to walk away from these proceedings as a millionaire.

To his credit, Aggarwal has taken steps in recent weeks to marshal assets for restitution. The government understands that Aggarwal has entered into a contract to sell his vacation home in Arnold, California for approximately $250,000, and will deposit the proceeds directly to the clerk of Court. The government also understands that Aggarwal has consented to the seizure of his retirement accounts, totaling over $660,000, and is working with the USAO on the necessary paperwork for the transfers. The government further understands that Aggarwal has listed homes in San Pablo and Mounting House, California, for sale, and will deposit those proceeds with the clerk of Court. Overall, we understand that Aggarwal will deposit approximately $1 million prior to sentencing, with as much as $700,000 to follow when the sales of the other two homes are complete.

Although the government still has concerns about Aggarwal's decision to lock such a large portion of his liquid assets in his current residence while pending sentencing, the recent actions he has taken to pay restitution have been encouraging. On balance, though, in order to drive home to Aggarwal, and others who may one day follow in his footsteps, that these crimes are unacceptable, this Court should impose a significant custodial sentence.

## B.   Supervised Release

The government recommends a term of supervised release of three years. This is in line with the guidelines provision. The government understands that Aggarwal may intend to return to his accounting business following any term of incarceration imposed. A three-year term of supervised release will help protect the community by ensuring that he does not commit new frauds.

## C.   Restitution

The government and defense have had extensive negotiations regarding the appropriate restitution amount in this case. The government requests a restitution hearing 90 days from the sentencing hearing. If the parties agree to the restitution amount, they will file a stipulation.

## VI.   CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the defendant to 24 months' imprisonment, 3 years' supervised release, and a $100 special assessment per count.

DATED: March 30, 2026                                Respectfully submitted,

                                                     CRAIG H. MISSAKIAN
                                                     United States Attorney

                                                     */s/ Evan M. Mateer*
                                                     EVAN M. MATEER
                                                     DAVID J. WARD
                                                     Assistant United States Attorneys